# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

MATTHEW KNECHT,

               Plaintiff,

     v.

ANDREI BALANESCU, et al.,

               Defendants.

CIVIL ACTION NO. 4:16-CV-00549

(MEHALCHICK, M.J.)

## MEMORANDUM

Before the Court are twelve motions *in limine* filed by the parties in anticipation of trial. In addition to briefing, the Court held oral argument on the motions during the October 2, 2017 pretrial conference.

## I. BACKGROUND AND PROCEDURAL HISTORY

As the Court writes primarily for the parties, the background and history are limited to the immediately relevant circumstances of the pending motions. On October 28, 2015, Plaintiff Matthew Knecht and Defendant Andrei Balanescu were both travelling west on I-80 near Turbot Township, PA. (Doc. 17, ¶ 14). Balanescu was operating a tractor-trailer, delivering a load to a customer of Newburg Egg, while Knecht drove his father's Ford Focus. The tractor was owned by Hudson Truck Leasing LLC, and leased to Izzy Trucking Inc. The trailer was owned by JILCO Equipment Leasing Co. Inc., and leased to Newburg Egg.

Many of the facts and theories surrounding the accident remain in dispute. Knecht asserts that Balanescu's tractor-trailer struck him from behind, causing the accident that resulted in Knecht's severe injuries, necessary surgeries, and memory loss. (Doc. 17, ¶ 19). The Defendants, citing the police report created by Trooper Edward Shannon, assert that Knecht

passed Balanescu from the right hand lane, lost control of his vehicle, came to a rest perpendicular across the travel lanes, and was struck on the passenger side by Balanescu's truck when Balanescu could not stop in time to avoid the crash. (Doc. 60, ¶ 17-19; Doc. 60-6, at 5). On March 30, 2016, Knecht filed suit against Balanescu, Izzy Trucking, A&B Trucking of Queens Inc., Hudson Truck Leasing, and JILCO, amending his complaint on October 14, 2016 to include Newburg Egg. (Doc. 1; Doc. 17). The Court recently decided several motions for summary judgment filed by all parties. (Doc. 133). As a result, remaining in the case and proceeding to trial are claims by Knecht against Balanescu for recklessness (Count I), Izzy Trucking for recklessness via vicarious liability (Count II), negligent hiring, supervision, and retention (Count III), and negligent entrustment (Count IV), and Newburg Egg for agency/joint venture (Count XIII), negligence and recklessness via vicarious liability (Count XIV), negligent hiring, supervision, and retention (Count XV), and negligent entrustment (Count XVI). Issues of causation, liability, and damages remain disputed.

## II.  STANDARD OF REVIEW

The court is vested with broad inherent authority to manage its cases, which carries with it the discretion to rule on motions *in limine* prior to trial. *See Luce v. United States*, 469 U.S. 38, 41 n.4 (1984); *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 260 (3d Cir. 1983), *rev'd on other grounds sub nom.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) (noting that the court exercises its discretion to rule *in limine* on evidentiary issues "in appropriate cases"). Courts may exercise this discretion in order to ensure that juries are not exposed to unfairly prejudicial, confusing or irrelevant evidence. *United States v. Romano*, 849 F.2d 812, 815 (3d Cir. 1988). Courts may also do so in order to "narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Bradley v. Pittsburgh Bd. of Educ.*, 913

F.2d 1064, 1069 (3d Cir. 1990) (citation omitted). In considering motions *in limine*, which call upon the court to engage in preliminary evidentiary rulings under Rule 403 of the Federal Rules of Evidence, the Court begins by recognizing that these "evidentiary rulings [on motions *in limine*] are subject to the trial judge's discretion and are therefore reviewed only for abuse of discretion . . . . Additionally, application of the balancing test under Federal Rule of Evidence 403 will not be disturbed unless it is 'arbitrary and irrational.'" *Ely v. Cabot Oil & Gas Corp.*, No. 3:09-CV-2284, 2016 WL 454817, at *2 (M.D. Pa. Feb. 5, 2016) (citing *Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1213 (3d Cir. 1995) (citations omitted)); *see Bernardsville Bd. of Educ. v. J.H.*, 42 F.3d 149, 161 (3d Cir. 1994) (reviewing *in limine* rulings for abuse of discretion).

The Federal Rules of Evidence can aptly be characterized as evidentiary rules of inclusion, which are designed to broadly permit fact-finders to consider pertinent factual information while searching for the truth. *Ely v. Cabot Oil & Gas Corp.*, No. 3:09-CV-2284, 2016 WL 454817, at *3 (M.D. Pa. Feb. 5, 2016). The grounds for exclusion of evidence under Rule 403 are described as an exception to the general rule favoring admission of relevant evidence, and by permitting the exclusion of relevant evidence only when its probative value is "substantially outweighed" by other prejudicial factors, the Court's discretion in considering evidentiary rulings should consistently be exercised in a fashion which resolves all doubts in favor of the admission of relevant proof in a proceeding, unless the relevance of that proof is substantially outweighed by some other factors which caution against admission. *Ely*, 2016 WL 454817, at *3. The rules further provide that relevant evidence is generally admissible. FED. R. EVID. 402. Evidence is "relevant" if its existence simply has "any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." FED. R. EVID. 401(a)-(b).

However, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." FED. R. EVID. 403. The balancing test under Rule 403 provides as follows:

> [t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

FED. R. EVID. 403.

Federal Rule of Evidence 702 governs the admissibility of expert testimony and requires an expert witness to have "specialized knowledge" regarding the area of testimony. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and
>
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

"Rule 702 has three major requirements: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge [, *i.e.,* reliability]; and (3) the expert's testimony must assist the trier of fact [, *i.e.,* fit]." *United States v. Schiff*, 602 F.3d 152, 172 (3d Cir. 2010) (alterations in original) (quoting *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008)).

In general, the Federal Rules of Evidence embody a strong preference for admitting any evidence that may assist the trier of fact. FED. R. EVID. 402. Moreover, Rule 702 in particular "has a liberal policy of admissibility." *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997).

First, an expert is qualified if "the witness possess[es] specialized expertise." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). The United States Court of Appeals for the Third Circuit interprets the qualifications requirement liberally, and notes that "a broad range of knowledge, skills, and training qualify an expert as such." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994)*; Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 327-28 (3d Cir. 2002) ("[T]his specialized knowledge can be practical experience as well as academic training and credentials . . . ."). Thus, "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996); *see Pineda*, 520 F.3d at 244 & n.11 (collecting cases that illustrate the permissive nature of qualifications requirement). "However, at a minimum, a proffered expert witness must possess skill or knowledge greater than the average layman." *Betterbox*, 300 F.3d at 328 (quotation omitted).

The second requirement under Rule 702 is that "the process or technique the expert used in formulating the opinion is reliable." *Paoli*, 35 F.3d at 742. Therefore, "the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *Paoli*, 35 F.3d at 742 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993)). The *Daubert*

court noted that the assessment of whether testimony is based on a reliable foundation is "flexible." *Daubert*, 509 U.S. at 594.

The third and last requirement under Rule 702 is "that the expert testimony must fit the issues in the case." *Schneider*, 320 F.3d at 404. This requirement is satisfied where the "expert testimony proffered . . . is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Downing*, 753 F.2d at 1242; "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591-92. Although the applicable standard for determining "fit" is "not that high," it is nonetheless "higher than bare relevance." *Paoli*, 35 F.3d at 745.

As a final note, in performing its gatekeeping function to determine whether an expert's proffer is reliable and relevant under *Daubert* and Rule 702, the trial court "is not to weigh the evidence relied upon or determine whether it agrees with the conclusions reached therein." *Walker v. Gordon*, 46 F. App'x 691, 695 (3d Cir. 2002) (not precedential) (citing *Breidor v. Sears, Roebuck & Co.*, 722 F.2d 1134, 1138-39 (3d Cir. 1983) ("Where there is a logical basis for an expert's opinion testimony, the credibility and weight of that testimony is to be determined by the jury, not the trial judge.")).

In keeping with this framework, the Court turns to each of the motions *in limine* filed by the parties.

## III. DISCUSSION

### A. MOTIONS *IN LIMINE* DEEMED UNOPPOSED OR WITHDRAWN.

Initially, the Court notes that three of the motions filed by the parties are deemed unopposed based upon the representations made by the parties at oral argument. First, Plaintiff noted on the record that it does not oppose Defendants' motion *in limine* to preclude evidence

or testimony from Dr. Ardo with regard to future medical treatment and associated costs other than chiropractic care. (Doc. 84). Specifically, Plaintiff noted that if Dr. Ardo is called as a witness, she will be called in her capacity as a treating physician. Second, Plaintiff filed a motion *in limine* to preclude Defendants from offering any evidence or testimony that he was not wearing his seatbelt at the time of the accident (Doc. 100); Defendants noted on the record that they do not oppose this motion. Finally, Plaintiff filed a motion *in limine* to preclude Defendants' use of "late" rebuttal reports (Doc. 109); Plaintiff indicated on the record that they could "work this issue out" and was not seeking to pursue this motion at this time.

For these reasons, the Court will **GRANT** Defendants' motion *in limine* seeking to limit Dr. Ardo's testimony (Doc. 84), and **GRANT** Plaintiff's motion *in limine* seeking to preclude evidence or testimony of Plaintiff not wearing his seatbelt. The Court will deem **WITHDRAWN** and **MOOT** Plaintiff's motion regarding the rebuttal reports. (Doc. 109).

B. MOTION *IN LIMINE* FOR SPOLIATION, SEEKING JUDGMENT IN PLAINTIFF'S FAVOR, OR AN ADVERSE INFERENCE AND REASONABLE ATTORNEY FEES AND COSTS (DOC. 92)

Plaintiff seeks judgment in his favor, or in the alternative, an adverse inference instruction to the jury, and attorney fees and costs, for the alleged failure of Defendants Izzy Trucking, Newburg Egg, and Andrei Balanescu to maintain, preserve and provide certain relevant documentation consistent with the FMCSRs and the laws and rules of the Commonwealth of Pennsylvania. Specifically, Plaintiff submits that, immediately after the crash, he advised all Defendants of their duties with respect to record retention, and further, that during discovery, Plaintiff propounded Requests for Production of Documents upon the Defendants requesting all the documentation identified in the initial spoliation letters. Plaintiff avers that Defendants Balanescu and Newburg Egg failed to provide verified responses at all,

and Defendant Izzy Trucking provided verified responses which are in conflict with the sworn testimony and evidence. (Doc. 93).

In opposition to Plaintiff's motion, Defendant Newburg Egg disputes that it ever had any control over the evidence sought by Plaintiff, as Newburg Egg was not a motor carrier, and therefore not subject to the records retention provisions of the FMSCR, as claimed by the Plaintiff, and as such, the documents sought by Plaintiff were never in Newburg Egg's possession or control. (Doc. 116). Defendants Izzy Trucking and Andrei Balanescu also oppose the motion, providing copies of the verifications produced in response to discovery (Doc. 119-1), and noting that both Israel Newman, the corporate designee for Izzy Trucking, and Balanescu were deposed, during which time numerous exhibits and documents were reviewed.

The general principles regarding inferences to be drawn from the loss or destruction of one or more documents are well-established in the Third Circuit. *Burdyn v. Old Forge Borough*, No. 3:12-CV-2236, 2017 WL 382304, at *7 (M.D. Pa. Jan. 26, 2017). "In law, spoliation refers to the hiding or destroying of litigation evidence, generally by an adverse party." *Archer v. York City School District*, 227 F.Supp.3d 361 (M.D.PA. Dec. 28, 2016); *Williams v. BASF Catalysts LLC*, 765 F.3d 306, 320 (3d Cir. 2014) (internal citations and quotations omitted). "In the event that a party undertakes spoilage, the sanctions available to a court include dismissal of the relevant claim or a presumption by the factfinder that the spoiled evidence was harmful to the offending party's case." *Capogrosso v. 30 River Court East Urban Renewal Co.*, 482 Fed.Appx. 677, 682 (3d Cir. 2012) (*citing Bull v. United Parcel Service, Inc.*, 665 F.3d 68, 72–73 (3d Cir. 2012)). "The spoliation inference is a permissive inference that is predicated on the "common sense observation" that when a party to an adversarial proceeding destroys relevant evidence it is likely done out of fear that the evidence would be harmful to that party." *Kounelis v. Sherrer*, 529

F.Supp.2d 503, 520 (D.N.J. 2008) (*citing Mosaid Techs. Inc. v. Samsung Elec. Co.*, 348 F.Supp.2d 332, 336 (D.N.J. 2004)).

Spoliation occurs where (1) the evidence was in the party's control; (2) the evidence is relevant to the claims or defenses in the case; (3) there has been actual suppression or withholding of evidence; and (4) the duty to preserve the evidence was reasonably foreseeable to the party. *Bull v. United Parcel Service, Inc.*, 665 F.3d 68, 73 (3d Cir. 2012). The party asserting that spoliation has occurred has the burden of establishing these elements. *See Sarmiento v. Montclair State Univ.*, 513 F.Supp.2d 72, 94 (D.N.J. 2007), *aff'd*, 285 Fed.Appx. 905 (3d Cir. 2008); *Gentex Corp. v. Sutter*, 827 F.Supp.2d 384, 390 (M.D. Pa. 2011). Where a court finds spoliation occurred, it must then determine the appropriate response, and should consider (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Gentex Corp.*, 827 F. Supp. 2d at 390–91 (M.D. Pa. 2011); *citing Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (1994). "Potential sanctions for spoliation include: dismissal of a claim or granting judgment in favor of a prejudiced party; suppression of evidence; an adverse inference, referred to as the spoliation inference; fines; and attorneys' fees and costs." *Id.; citing Mosaid Techs. Inc. v. Samsung Elecs. Co., Ltd.*, 348 F.Supp.2d 332, 335 (D.N.J.2004) (internal citations omitted). No adverse inference can be drawn from the mere fact of an inability to produce the records, absent evidence that they were intentionally concealed or destroyed. *Fortune v. Bitner*, No. CIV. 3:CV-01-0111, 2006 WL 839346, at *1 (M.D. Pa. Mar. 29, 2006); *Harding v. CareerBuilder, LLC*, No. 05-1934, 2006 WL 460896 (3d Cir. Feb 27, 2006).

As ruled at the conclusion of oral argument on the motions *in limine*, the Court does not find that there was intentional destruction or concealment of records by any of the Defendants to the extent such an inference is warranted. As such, the Court will not grant Plaintiff's motion seeking either judgment in his favor or an adverse inference on spoliation at this time. This is without prejudice to the Plaintiff to reiterating his request at such time as the Court considers jury instructions, and dependent upon the record developed at trial.

C. MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OF THE ALLEGED OCCURRENCE OF A PURSUIT INTERVENTION TECHNIQUE MANEUVER (DOC. 86)

Defendants seek to preclude introduction at trial of any evidence or testimony regarding the alleged occurrence of a pursuit intervention technique ("PIT") maneuver.

At the magisterial district court proceeding regarding the citations issued to Plaintiff as a result of the subject accident, Pennsylvania State Trooper Edward Shannon testified as follows:

> After the date of the collision, I was presented an opportunity to take photographs of unit one, Mr. Knecht's vehicle, and there is an indication that there was possibly contact prior to Mr. Knecht impacting with the guardrail, which would indicate possibly a PIT-type maneuver on the vehicle.
>
> There was a white paint transfer on the rear driver side quarter panel, along with damage to the side, which is consistent with the impact that I did observe. …

(Doc. 87-3, at 4).

Dr. Frank Gomer, designated by Plaintiff as a Human Factors Engineering expert, relies upon the testimony of Trooper Shannon in his report, in which he opines that

> … Officer Shannon concluded that, in terms of causation, the Volvo commercial ruck with trailer had impacted the left rear side of Ford Focus in a "PIT-type maneuver." When applying a PIT or Pursuit Intervention Technique maneuver to the circumstances of this case, the Volvo commercial truck with trailer had failed to remain in the left travel lane and had veered into the right travel lane, striking the left rear side of the Ford Focus, which was being driven in the right travel lane.

(Doc. 87-2, at 2).

Dr. Gomer did not conduct an independent physical inspection of the vehicle, or make an independent assessment of whether the vehicles engaged in a PIT-type maneuver, but simply relies entirely upon the testimony of Trooper Shannon. His report is inaccurate in its summation of Trooper Shannon's testimony. At no time in his testimony did Trooper Shannon conclude that a PIT maneuver caused the accident. As such, Dr. Gomer's opinion is based on an inaccurate interpretation of speculative testimony by Trooper Shannon, who has not been qualified as, or even identified as an accident reconstruction expert, and who merely testified to a ***possibility*** of a PIT-type maneuver having occurred.

Rule 702 mandates that the relevant expert testimony "must be supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Withrow v. Spears*, 967 F. Supp. 2d 982, 992 (D. Del. 2013); *citing Daubert*, 509 U.S. at 590, 113 S.Ct. 2786; *see also Schneider*, 320 F.3d at 404. The information provided by experts should be "ground[ed] in the methods and procedures of science" and be "more than subjective belief or unsupported speculation." *Id.*; *citing Daubert*, 509 U.S. at 590, 113 S.Ct. 2786; *see also Schneider*, 320 F.3d at 404.[5] In examining this requirement, a court's focus must be on "principles and methodology" rather than on the conclusions generated by the expert. *Id.*; *citing Daubert*, 509 U.S. at 595, 113 S.Ct. 2786; *see also Schneider*, 320 F.3d at 404.

Dr. Gomer's reference to the PIT maneuver is not grounded in any method or procedure of science, and is based wholly on the testimony of Trooper Shannon, which was speculative at best. As such, any reference by Dr. Gomer to a PIT type maneuver shall be precluded at trial.

Further, Dr. Gomer has been identified as a human factors and safety engineering expert expected to testify that Balanescu displayed symptoms of fatigue and drowsiness, failed to perceive Knecht's vehicle in the lane of travel, failed to disengage the diesel engine brake, failed to remain aware of anticipating "12 to 15 seconds ahead," and failed to keep accurate driving logs. (Doc. 126). Both parties have identified experts in accident reconstruction (Doc. 118, Doc. 126). Dr. Gomer's opinion on the use of a potential PIT maneuver encroaches on the subject area of accident reconstruction, and for that reason also, should also not be permitted. *See Dolfman v. Edwards*, No. CIV.A. 13-2831, 2015 WL 3477736, at *3 (E.D. Pa. June 2, 2015) (precluding the testimony of a human factors expert where it sometimes encroached on accident reconstruction, as she had no expertise in this field and should not be permitted to offer opinions that reconstruct the accident scene for the jury).

Additionally, the Court finds that any reference to a PIT-type maneuver is likely to confuse the issues in this case and results in a risk of unfair prejudice, particularly since none of the accident reconstruction experts identified by the parties reference such a maneuver. Further, the Court finds that the use and application of a PIT-type maneuver is not within the ordinary knowledge and experience of a layperson, and as such, requires expert testimony to establish. Trooper Shannon has not been identified or qualified as an expert in the area of accident reconstruction, and further, merely speculates as to a ***possibility*** of a PIT-type maneuver occurring. The Court finds that the risk of allowing such speculative testimony by Trooper Shannon far outweighs any probative value the speculative testimony might have, particularly where, as in this case, both sides have identified accident reconstruction experts. It is well established law that "an investigating police officer who did not witness an accident may not render an opinion at trial as to its cause unless he or she has been qualified as an expert." *Smith*

*v. Clark*, 411 Pa. 142, 190 A.2d 441 (1963); *Reed v. Hutchinson*, 331 Pa.Super. 404, 480 A.2d 1096 (1984); *Lesher v. Henning*, 302 Pa.Super. 508, 449 A.2d 32 (1982); *Anderson v. Russell*, 33 Pa. D. & C.3d 308 (1983). Trooper Shannon is identified as the trooper who responded to the scene, not as an accident reconstruction expert, and has not been qualified as such. *See Higginbotham v. Volkswagenwerk Aktiengesellschaft*, 551 F. Supp. 977, 982–83 (M.D. Pa. 1982), *aff'd*, 720 F.2d 662 (3d Cir. 1983), *and aff'd sub nom. Volkswagen Werk Aktiengesellschaft v. Hummel*, 720 F.2d 669 (3d Cir. 1983) (Even with experience as an accident investigator, officer could not be qualified as an expert in accident reconstruction or to offer an opinion as to what happened at the time of the accident.).

As such, any evidence or reference to an alleged PIT-type maneuver shall be precluded at trial.

D. MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OF PRIOR MOVING VIOLATIONS AND CITATIONS BY DEFENDANT, ANDREI BALANESCU (DOC. 88)

Defendants seek to preclude any evidence or testimony regarding Defendant Balanescu's prior moving violations and citations. Specifically, Balanescu's prior moving violations include driving without a seatbelt, using a cellular device while driving, and two convictions for driving under the influenced, both of which occurred between January 2012 and August 2014. (Doc. 89 at 3). Defendants submit that this evidence should be precluded pursuant to Federal Rule of Evidence 404(b), which precludes the admission of prior bad acts of a party unless it is relevant for a purpose other than showing a propensity or disposition on the part of the defendant. Plaintiff submits that this evidence should be allowed as he seeks to use this evidence as part of his proof of his negligent hiring/supervision/retention and negligent entrustment claims against Defendants Izzy Trucking and Newburg Egg.

In order to admit evidence under Rule 404(b), a court must be able to articulate a way in which the tendered evidence logically tends to establish or refute a material fact in issue, and that chain of logic must include no link involving an inference that a bad person is disposed to do bad acts. *Government of the Virgin Islands v. Pinney*, 967 F.2d 912, 915 (3d Cir.1992). For evidence to be admissible under Rule 404(b): (1) the evidence must have a proper purpose under Rule 404(b); (2) it must be relevant under Rule 402; (3) its probative value must outweigh its prejudicial effect under Rule 403; and (4) the court must charge the jury to consider the evidence only for the limited purpose for which it was admitted. *Becker v. ARCO Chem. Co.*, 207 F.3d 176, 189 (3d Cir. 2000) (internal citations omitted). when a proponent of Rule 404(b) evidence contends that it is both relevant and admissible for a proper purpose, "the proponent must clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the crime charged." *See id.* (internal quotation marks omitted); *Himelwright*, 42 F.3d at 782 (*citing United States v. Jemal*, 26 F.3d 1267, 1272 (3d Cir.1994)).

In examining the factors to be considered under Rule 404(b), the Court finds that the evidence in question – Balanescu's prior moving violations – is relevant to Plaintiff's claims of negligent hiring and retention, and therefore has a proper purpose under Rule 404(b). The Court next turns to the issue of whether the probative value of this evidence outweighs the prejudicial effect under Rule 403. The risk of the jury inferring a propensity by Defendant Balanescu might be inclined to commit a violation on the day of the accident due to his past moving violations is possible, and the Court finds that the prejudice that might attach to Defendant Balanescu's prior DUI arrests to outweigh any probative value they might have to Plaintiff's negligent hiring claims, particularly  since those arrests are wholly unrelated to his

- 14 -

operation of a tractor-trailer.[1] However, the Court finds that the prejudice that might attach to the remaining prior moving violations, including driving without a seatbelt, speeding violations, and using a cellular device while driving, does not outweigh the probative value to Plaintiff's negligent hiring claims. Further, the Court will instruct the jury on the proper consideration of this evidence for the purpose of the negligent hiring claims only, and not to show any propensity by Defendant Balanescu to act in accordance with his past behavior. This instruction will be given at all appropriate stages of trial, including before the introduction of this evidence, and during closing instructions. As such, Defendant's motion is granted in part and denied in part.[2]

E. MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OF POST-ACCIDENT DRUG AND ALCOHOL TESTING OF DEFENDANT, ANDREI BALANESCU (Doc. 90)

Defendants Andrei Balanescu and Izzy Trucking also seek preclusion of evidence relating to post-accident drug and alcohol testing. (Doc. 90). In the immediate aftermath of the accident, Balanescu contacted Israel Newman, who arrived on scene. Per Newman's deposition testimony, Balanescu was not tested for drugs or alcohol until the next day, some 14 hours after the accident occurred. The Federal Motor Carrier Safety Regulations provide that the employer shall conduct drug and alcohol testing of a driver involved in an accident "[a]s soon as

---

[1] The record before the Court is undisputed that one DUI involved a private vehicle where Defendant Balanescu sat smoking a cigarette with the ignition on; the other involved marijuana found in his son's toolbox.

[2] *See also Williams v. Boulevard Lines, Inc.*, No. 10 CIV. 2924 DF, 2013 WL 5652589, at *9 (S.D.N.Y. Sept. 30, 2013) (Evidence of defendant's past driving record, showing a history of violations, would be admissible on Plaintiff's claims against employer to prove its negligent hiring and retention, but inadmissible as against defendant driver to prove character or propensity for negligent driving.)

practicable." 49 C.F.R. § 382.303(a).[3] This testing is mandatory in cases where the accident involves a fatality, or if the commercial driver receives a citation and another person requires immediate medical attention away from the scene of the accident or any vehicle involved in the accident is disabled as a result. 49 C.F.R. § 382.303(a). This citation must be received within eight hours of the accident in order to mandate alcohol testing, or thirty-two hours for drug testing. 49 C.F.R. § 382.303(a)-(b). Further, if testing is deemed required, the employer must administer an alcohol test within two hours of the accident and a drug test within thirty-two hours. 49 C.F.R. § 382.303(d). An employer who fails to do so must prepare and maintain a record stating the reasons why a test was not promptly administered. 49 C.F.R. § 382.303(d). The Regulations provide a table to analyze whether a test is required under specific circumstances:

| Table for § 382.303(a) and (b) | | |
|---|---|---|
| Type of accident involved | Citation issued to the CMV driver | Test must be performed by employer |
| i. Human fatality | YES | YES. |
| | NO | YES. |
| ii. Bodily injury with immediate medical treatment away from the scene | YES | YES. |
| | NO | NO. |
| iii. Disabling damage to any motor vehicle requiring tow away | YES | YES. |
| | NO | NO. |

---

[3] The provisions for alcohol testing and drug testing are listed separately, with the only difference being the length of time that may elapse prior to receipt of a citation before which testing is required. The Court cites to (a), which speaks only of alcohol testing, though both (a) and (b) are relevant to the instant motion as the specific differences have no effect on this analysis.

A review of this table demonstrates that no violation of the statute occurred. There was no fatality and Balanescu did not receive a citation for the accident. The Regulations require testing only where there is a fatality or the commercial driver received a citation; neither of which occurred.

Further, federal courts balk at the inclusion of statutory violations that have no bearing on the causation of a commercial vehicle accident. Violation of a federal statute may lead to "liability under Pennsylvania law provided three elements are present: 1) the statute or regulation must clearly apply to the conduct of the defendant; 2) the defendant must violate the statute or regulation; and 3) the violation of the statute must proximately cause the plaintiff's injuries." *Karle v. Nat'l Fuel Gas Dist. Corp.*, 448 F.Supp. 753, 767 (W.D. Pa. 1978). A failure to conduct post-accident drug and alcohol testing as required by § 382.303 is "in no way causally related to the subject accident or injuries sustained therein." *Ditzler v. Wesolowski*, No. 3:2005-325, 2007 WL 2253596, at *7 (W.D. Pa. Aug. 3, 2007). *See generally Waldrop v. Coastline*, No. 3:13-CV-00204, 2015 WL 11257573, at *6 (N.D. Ga. Mar. 12, 2015). Thus, as a failure to adhere to post-accident regulatory provisions has no bearing on causation, evidence thereof should be generally withheld given its irrelevance to the facts.

Knecht raises two arguments for inclusion: first that the Defendants did not know whether the Plaintiff would die as a result of the crash; and second that a failure to conduct post-accident testing fits a pattern of violations to support Knecht's claim of negligent hiring, supervision, and retention. Neither is persuasive. While it is true that neither Balanescu nor Israel Newman could have known whether Matthew Knecht would survive the accident, the Regulations do not require those involved in accidents to engage in speculation, and do not include the "possibility" of death. It is well established that courts engaging in statutory

interpretation first look to the plain language of the statute and where "the statutory language is plain and unambiguous, further inquiry is not required, except in the extraordinary case where a literal reading of the language produces an absurd result." *Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 202 (3d Cir. 1998) (citations omitted). Here, the language of the statute is plain and unambiguous. There was no fatality, and Balanescu was not cited for any role in the crash. Thus, there was no inherent failure on the part of the Defendants in delaying testing until the following morning.

Further, the post-accident failures do not have any bearing on claims of negligent hiring, supervision, or retention. Pennsylvania courts have applied the Restatement (Second) of Torts to cases of negligent hiring, finding that employers have the duty to exercise reasonable care in selecting, supervising, and controlling employees. *See R.A. ex rel. N.A. v. First Church of Christ*, 748 A.2d 692, 697 (Pa. Super. Ct. 2000). In order "to fasten liability on an employer . . . it must be shown that the employer knew or, in the exercise of ordinary care, should have known of the necessity for exercising control of his employee." *R.A. ex rel. N.A.*, 748 A.2d at 697 (quoting *Dempsey v. Walso Bureau, Inc.*, 246 A.2d 418, 422 (Pa. 1968)). Without a length recitation, liability for negligent hiring, supervision, or retention is predicated upon failures leading up to an incident upon which a lawsuit is predicated. The cause of action requires that employer knew or should have known of the potential harm prior to the occurrence of an incident. Acts that occur after the incident predicating a cause of action are irrelevant to analysis of negligent hiring, supervision, or retention, as the failure on the part of the employer has already manifested in harm.

Evidence of a failure to conduct post-accident drug and alcohol testing is a failure to react to an incident, not a failure to appreciate the possibility of or prevent an incident. In the

case at hand, the allegation is that Israel Newman's failure to immediately conduct drug and alcohol testing after the crash fits a pattern of FMCSR violations and is "directly relevant" to claims for negligent hiring, supervision, and retention. However, post-accident conduct is irrelevant to establishing negligent hiring, supervision, and retention because the opportunity to prevent harm has passed. The post-accident shortcomings are severable from the claims predicated upon conduct prior to the accident. Thus, evidence of a failure to conduct post-accident drug and alcohol testing will not assist the trier of fact.

Evidence of the post-accident testing offers no assistance in resolving the issue of causation, nor in claims of negligent hiring, supervision, or retention. Even was such evidence relevant, the risk of unfair prejudice and confusion is high. *See* Fed. R. Evid. 403. Defendants were under no obligation to conduct any testing under the Regulations, and any evidence of a failure to act would cloud the issues by virtue of not addressing the claims at hand. Accordingly, the Defendants motion *in limine* to preclude any evidence or testimony regarding post-accident drug and alcohol testing of Andrei Balanescu at the time of trial (Doc. 90) is **GRANTED**.

F. MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OF ALLEGED HOURS OF SERVICE OR FEDERAL MOTOR CARRIER SAFETY REGULATIONS VIOLATIONS (DOC. 96)

Defendants Balanescu and Izzy Trucking move to preclude any evidence or testimony about alleged hours of service violations and/or Federal Motor Carriers Safety Regulations. (Doc. 96). Specifically, Defendants argue that evidence of hours of service violations is based on mere speculation and irrelevant to this matter. (Doc. 97). Plaintiff responds that two experts, Dr. Frank Gomer and Mr. Dennis Wylie, are prepared to testify that Balanescu was drowsy and fatigued at the time of the accident as a result of hours of service violations. (Doc. 125).

Further, Plaintiff asserts that Balanescu's drowsiness affected his actions at the time of the crash, including reaction time and ability to anticipate ahead. (Doc. 125).

At the heart of their motion, Defendants argue that Plaintiff's offered experts engage in impermissible speculation based on the driver logs and deposition testimony of Balanescu. The requirements for experts under the Federal Rules of Evidence dictate that a qualified witness may offer an opinion if their expertise will assist the trier of fact understand evidence or determine a fact, so long as the testimony is: based on sufficient facts or data; the product of reliable methodology; and the product of a reliable application of the methodology to the facts in the case. FED. R. EVID. 702. However, the opinion of an expert must be more than mere speculation. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993). There is no magic word or particular phrase experts must use in their opinion, but use of limiting terms such as "possibility" reflects the degree of certainty and allows for questions on the strength of the expert's opinion. *See Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 785 (3d Cir. 1996) (citations omitted).

Turning first to Dr. Gomer, the opinion does contain limitation language. The phrase challenged by Defendants is Dr. Gomer's conclusion that Balanescu "probably exceeded the maximum driving time allowed" based on inaccurate driver logs. (Doc. 97-3, at 6). While it is entirely possible that Balanescu indeed exceeded the maximum driving time allowed by the Regulations, Dr. Gomer has not provided a sufficient basis for concluding such a violation occurred. Dr. Gomer does not provide a scientific or specialized basis for connecting inaccurate driver logs with an hours violation. In his brief in opposition, Plaintiff focuses on the totality of Dr. Gomer's opinion, arguing that Dr. Gomer's conclusions on drowsiness affecting Balanescu's capabilities are supported by Dr. Gomer's expertise. However, the specific issue is

whether evidence on an hours violation occurred, not whether Balanescu was drowsy and fatigued. To that end, Dr. Gomer's report does not provide an adequate foundation for determining that Balanescu exceeded the hours maximum contemplated in the Regulations. Dr. Gomer's conclusions of an hours violation are impermissibly speculative.

As for Mr. Wylie's opinion, Defendants argue that his conclusions on a potential hours violation are inadequate because Mr. Wylie cannot pinpoint when and where any hours or speed violations would have occurred. (Doc. 97, at 5). The critical inquiry in evaluating an expert is the rationale for the expert's opinion, more so than the eventual conclusion. All of the factors enumerated in Rule 702 focus on the underlying foundation of the expert's opinion as opposed to the opinion itself. *See* FED. R. EVID. 702. Mr. Wylie's opinion contains an individualized trip breakdown, with separate analysis based on Balanescu's driving logs and computerized mapping software. (Doc. 97-4). Mr. Wylie's opinion mentions a possibility of an hours violations, but reaches the conclusion that Balanescu was impaired as a result of drowsiness for multiple reasons and offers no affirmative declaration that hours violations occurred. Mr. Wylie's methodology appears inherently reliable and based in calculable fact, not speculation. Because Mr. Wylie is available to testify to his degree of belief that violations occurred and the reasons therefor, and has provided an adequate foundation for his opinions, the Court will not restrict consideration of Mr. Wylie's opinion, including on a potential hours violation.

The Defendants have also challenged the relevance of evidence of an hours violation. As stated above, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence[] and the fact is of consequence in determining the action." FED. R. EVID. 401. Causation in this matter remains squarely at issue. To that end,

drowsiness on the part of Balanescu bears on causation, should a jury determine that he did not have the ability to react to changing conditions, such as Plaintiff's car in the roadway. Both experts offer opinions that the amount of driving and sleep schedule of Balanescu affected his cognitive function at the time of the crash and prevented reactionary preventative measures. Plainly, evidence thereof is relevant to resolving these claims.

In light of the foregoing, the Defendants motion *in limine* to preclude any evidence or testimony about alleged hours of service violations and/or Federal Motor Carrier Safety Regulations violations (Doc. 96) is **GRANTED** in part and **DENIED** in part. The Court further finds that the expert report of Dr. Gomer does not provide a foundation for affirmatively concluding that Balanescu committed hours violations, and as the opinion engages in impermissible speculation, Dr. Gomer will not be permitted to testify that Balanescu drove in excess of the FMCSR maximum allowable hours.

G. MOTION *IN LIMINE* TO PRECLUDE REFERENCE TO PLAINTIFF'S ALCOHOL LEVEL, USE OF ADDERALL, USE OF SUBOXONE, AND PAST DRUG USE (DOC. 98)

**1. Alcohol Level**

Plaintiff moves to exclude any evidence or reference to the alcohol serum levels found in his bloodstream at the hospital following the accident, and to the presence of alcohol generally. (Doc. 99, at 4). In support, he argues that under Pennsylvania law the presence of alcohol must be corroborated by independent evidence of impairment. (Doc. 99, at 5). Further, he argues that any evidence of alcohol would be extremely prejudicial, one of the foundational principles for the Pennsylvania law as cited. Defendants respond that the standard only requires supporting evidence where the degree of intoxication does not reflect an inherent unfitness to drive. (Doc. 112, at 4-5). They also assert that the testimony of experts constitutes corroborative evidence,

and that Plaintiff's combativeness at the hospital is also enough to warrant inclusion. (Doc. 112, at 8).

As a preliminary matter, the parties agree that Pennsylvania law determines whether or not evidence of intoxication is admissible at trial. The recent Pennsylvania Supreme Court case *Coughlin v. Massaquoi*, -- A.3d --, No. 32 EAP 2016, 2017 WL 4287350 (Pa. Sep. 28, 2017) provides a succinct summary of the standards governing inclusion of evidence of intoxication in civil cases. One of the earliest cases to address evidence of intoxication by either the driver or the victim in a civil case was *Critzer v. Donovan*, 137 A. 665 (Pa. 1927). Recognizing the inherent stigma and prejudice that would result from evidence of any level of intoxication, the Pennsylvania Supreme Court cautioned that "[c]are should be then taken as to the use of such evidence." *Critzer*, 137 A. at 666. The Court then found it error to allow the inclusion of such evidence unless the evidence demonstrates intoxication. *Critzer*, 137 A. at 666. The evidence presented in that case—odor of liquor—was not by itself indicative of intoxication, but the Court did not go so far as to say that stand-alone evidence would be patently inadequate for admissibility.

The Supreme Court again considered the standards for evidence of drinking in *Fisher v. Dye*, 125 A.2d 472 (Pa. 1956), the case cited by the Defendants as the applicable standard. In *Fisher*, a "considerable" amount of evidence was presented that the Defendant driver had been drinking heavily at a club prior to the accident. *Fisher*, 125 A.2d at 476. Having granted a new trial on separate grounds, the *Fisher* Court cautioned "the mere fact of drinking intoxicating liquor is not admissible, being unfairly prejudicial, unless it reasonably establishes a degree of intoxication which proves unfitness to drive." *Fisher*, 125 A.2d at 476.

Fourteen years later, the Pennsylvania Supreme Court addressed the specific issue raised here: introduction of a driver's BAC. *See Billow v. Farmers Trust Co.*, 266 A.2d 92 (1970). The Court upheld the trial court's exclusion of BAC evidence where the necessary supporting evidence for the BAC fell short of Pennsylvania standards. *See Billow*, 266 A.2d at 93. Specifically, the Court agreed with exclusion of evidence of the deceased driver's BAC of .14, where an expert testified that the driver would be "affected" in his driving. *See Billow*, 266 A.2d at 93. The Court reiterated that evidence of "drinking intoxicating liquor is not admissible, being unfairly prejudicial, unless it reasonably establishes a degree of intoxication which proves unfitness to drive. *See Billow*, 266 A.2d at 93 (quoting *Morreale v. Prince*, 258 A.2d 508 (Pa. 1969)). Determining that testimony that the driver would be affected rather than unfit to drive, the Court upheld exclusion of this evidence.

Whereas *Billow* did not explicitly require additional evidence of intoxication to permit introduction of BAC, the Superior Court considered independent evidence to support intoxication necessary with its decision in *Ackerman v. Delmonico*, 486 A.2d 410, 414 (Pa. Super. Ct. 1984). In *Ackerman*, the Superior Court found that "blood alcohol level alone may not be admitted for the purpose of proving intoxication. There must be other evidence showing the actor's conduct which suggests intoxication. Only then, and if other safeguards are present, may a blood alcohol level be admitted." *Ackerman*, 486 A.2d at 414. The cases cited by Knecht have interpreted *Ackerman* as requiring objective indications of intoxication beyond a BAC and expert testimony on the effects. *See Rohe v. Vinson*, 158 A.3d 88, 98 (Pa. Super. Ct. 2016) ("relation back" testimony on a plaintiff's BAC is speculative and prejudicial without independent evidence of intoxication); *Schuenemann v. Dreemz, LLC*, 34 A.3d 94, 103 (Pa. Super.

Ct. 2011) (affirming judgment under Dram Shop Act where evidence of BAC and expert testimony was corroborated by witness testimony on the conduct of the decedent).

In *Coughlin*, decided four days before oral argument on the instant motions, the Pennsylvania Supreme Court "reject[ed] the standard . . . utilized by the Superior Court in *Ackerman* and its progeny that requires independent, corroborating evidence of intoxication before BAC evidence may be admitted." *Coughlin v. Massaquoi*, -- A.3d --, No. 32 EAP 2016, 2017 WL 4287350, at *9 (Pa. Sep. 28, 2017). The *Coughlin* Court stated that the Supreme Court "has never endorsed this heightened evidentiary requirement for BAC evidence;" reiterating that the standard advanced in *Fisher* remains in effect. *See Coughlin*, 2017 WL 4287350, at *8. The Court held that while a BAC by itself may be insufficient to establish unfitness to cross a street, an expert's thorough testimony on the effects of a given BAC on behavior and mental processes and specific opinion that a particular BAC would render a pedestrian unfit to cross the street will overcome the prejudice that occurs with introduction of BAC evidence. *See Coughlin*, 2017 WL 4287350, at *8. While *Coughlin* dealt with a dispute over the introduction of the BAC of a pedestrian struck by a vehicle, Pennsylvania Courts have interpreted evidence of intoxication by a pedestrian involved in an accident and drivers to be "analogous." *See Kraus v. Taylor*, 710 A.2d 1142, 1145 (Pa. Super. Ct. 1998) (quoting *Kriner v. McDonald*, 302 A.2d 392, 394 (Pa. Super. Ct. 1973)).

Thus, consideration of the instant motion *in limine* becomes whether or not the testimony of an expert witness thoroughly describes the effects a given BAC would have on behavioral and mental processes, and specifically opines that a particular BAC would render an individual unfit to drive. Here, the expert opinion of Dr. Michael J. Whitekus meets the requirements set forth in *Coughlin*. Dr. Whitekus describes the effects that given BAC levels

have on an individual. (Doc. 99-1, at 7-8). Because of the uncertainty in the chain of events, the opinion considers three alternatives to determine the particular BAC level at the time of the accident, noting the stages of effects Plaintiff would be experiencing during each. (Doc. 99-1, at 6-7). Based on the levels calculated, Dr. Whitekus opined specifically that "Knecht was unfit to drive." (Doc. 99-1, at 7).

The expert opinion of Dr. Whitekus meets the standards outlined in *Coughlin* to ensure that the probative value of BAC evidence outweighs the prejudicial effect. Accordingly, evidence of alcohol will be admissible at trial.

## 2. Suboxone

In the same motion, Plaintiff also moves to preclude all references to his Suboxone and Adderall prescriptions and use. (Doc. 99, at 11-13). The lab reports from Plaintiff's treatment at Geisinger Medical Center following the accident reflect trace amounts of Adderall, for which he has a prescription. (Doc. 99-2). While tests did not indicate the presence of Suboxone, deposition testimony and medical records indicate Plaintiff had consistently taken Suboxone as part of his recovery from addiction in the months leading up to and including the date of the accident. Plaintiff argues that permitting the admission of evidence on these drugs in his system will be prejudicial, and, in the case of Suboxone, speculative. Neither brief in opposition submitted by the Defendants discuss Adderall, however both argue that Suboxone use is relevant because of the dangerous effects that may occur from mixing Suboxone with alcohol. (Doc. 112, at 8; Doc. 120, at 12).

The parties all rest upon the same standard for admissibility of Suboxone use: Rule 403. Under Rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice,

confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Civ. P. 403. Knecht argues "[t]here is not a shred of evidence in the record to suggest Plaintiff was taking Suboxone on [the date of the crash], and due to the extreme prejudice the admission of this evidence would cause Plaintiff to endure, it must be precluded." (Doc. 99, at 13). Defendants note that Plaintiff and his father both testified at depositions to daily use, and that his urine tests provided as part of his addiction treatment "were always positive for buprenorphine, the active ingredient in Suboxone." (Doc. 120, at 12; Doc. 112, at 9). They argue there is no evidence that Plaintiff had stopped taking Suboxone prior to the accident.

While this logic is dangerously close to requiring the Plaintiff prove a negative, there is enough evidence to allow a reasonable juror to conclude that Plaintiff took Suboxone on the day of the accident. Knecht's father testified that he personally administered his son's Suboxone and watched it taken, with no reason to dispute continued use up to the day of the accident. (Doc. 112, at 57). Plaintiff himself testified that he believed he was still on Suboxone in October of 2015, when the accident occurred, but that he did not necessarily take it every day. (Doc. 99-6, at 73). Defendants also note that Knecht's discharge papers advise that he stop taking Suboxone, with the logical inference that he was therefore still on it at the time of the accident. (Doc. 99-2, at 27).

Of course, none of the evidence cited conclusively establishes that Knecht took Suboxone on the day of the accident, however it would at least tend to indicate that he did. Under Rule 401, previously provided and thus the text of which is omitted here, evidence is relevant if it would make a fact more or less probable and that fact is of consequence to the action. The above evidence would tend to make it more probable that the Plaintiff had taken

Suboxone on the day in question. Expert testimony in this case affirmatively states that Suboxone combined with alcohol can have drastic effects, including sedation. As causation remains squarely at issue here, the combination of alcohol and Suboxone is relevant to determining what happened on the night of October 28, 2015. Thus, there is still substantial probative value in the presentation of such evidence. Given the ability of both sides to present evidence on this issue and conduct thorough examination of the key witnesses, the risk of prejudice is outweighed by the probative value. Thus, evidence of Suboxone will not be precluded.

### 3. Adderall

The Court has been presented no theory or evidence that Adderall is considered a contributory factor in the accident. None of the Defendants raise an argument for its inclusion in their briefs in opposition, nor does defense expert witness Dr. Whitekus rely on Adderall in his toxicology report. The only references to Adderall on the record are passing remarks that the Plaintiff had an active prescription.

As with Suboxone, the Court's judgment is guided by Rules 401-403. Knecht's medical history is relevant to the cause of action, potentially bearing upon causation and certainly on the issue of damages as discussed further below. Accordingly, the prescriptions that Knecht regularly took to treat various medical issues generally warrant inclusion in evidence. Adderall does not inherently carry the same potentially prejudicial connotation as other controlled substances. However, in order to prevent undue prejudice or mischaracterization of the evidence, references to Adderall will be limited strictly to discussion of Knecht's medical situation. Defendants have not presented any evidence attaching the presence or use of Adderall to causation. Defendants' expert toxicologist wrote to great extent on the interplay between

Suboxone and alcohol, but undertook no discussion on any symptomatic effects that Adderall would have had on Knecht on the night in question. Because there is no dispute that Knecht had a valid prescription for Adderall, no allegation that he abused Adderall, and no evidence connecting Adderall to the crash, references to Adderall will be limited only to the fact that Knecht possessed a prescription and to encapsulate an accurate medical history.

### 4. Past Drug Use

Lastly, Knecht moves for preclusion of references to past drug use, arguing that the Defendants intend to present Knecht's battles with addiction to connect with the crash itself. (Doc. 99, at 14). He points to the expert opinion offered by Dr. Whitekus, which Knecht avers is replete with prejudicial overtones. (Doc. 99, at 14). He argues that as there were no illegal drugs in toxicology reports, any references to illegal drug use would be prejudicial and are not relevant to the accident itself. (Doc. 99, at 14). Defendants state that evidence of past drug use is admissible, as it relates squarely to the extent of damages due to loss of future earnings and cause of cognitive defects. (Doc. 112, at 10-11; Doc. 120, at 13-14).

Pennsylvania Courts permit the presentation of evidence of drug abuse where lifelong injuries are at issue. "A claim for damages for permanent injury 'requires the jury to evaluate the claimant's life expectancy. Evidence of appellant's chronic drug and alcohol abuse strongly suggests that his life expectancy deviates from the average.'" *Gfroehrer v. Calice*, No. 3:09-CV-2111, 2011 WL 5320712, at *3 (M.D. Pa. Nov. 1, 2011) (quoting *Kraus v. Taylor*, 710 A.2d 1142, 1144 (Pa. Super. Ct. 1998)). "Additionally, '[w]hen [actuarial] tables are submitted in a personal injury case, the jury must be permitted to consider individual characteristics that impact on the injured party's life expectancy.'" *Gfoehrer*, 2011 WL 5320712, at *3 (quoting *Kraus*, 710 A.2d at 1144) (alterations in original). Evidence of chronic drug abuse strongly

suggests that life expectancy deviates from the average. *Fife v. Bailey*, No. 3:14-1716, 2016 WL 1404202, at *3 (M.D. Pa. Apr. 11, 2016) (quoting *Kraus*, 710 A.2d at 1144). As this Court did in *Fife*, the best course of action given the high probative value and high potential for prejudice is to provide limiting instructions that evidence of past drug use "may only be used for the purpose of damages, specifically for its relevance to the plaintiff's earnings capacity and life expectancy." *See Fife*, 2016 WL 1404202, at *3.

Decreased cognitive function due to past drug use will be considered relevant to Plaintiff's earnings capacity. Evidence of drug use may be relevant to questions of causation and extent of damages regarding the injuries alleged. *See English v. Greyhound Bus Lines, Inc.*, 826 F.Supp.2d 728, 731 (E.D. Pa. 2011). Because the allegation here is of permanent brain injury as a result of the accident (Doc. 1, ¶¶ 21-28), the cause and extent of such an injury must be established. As past drug use may have diminished cognitive function and earnings capacity prior to the accident, evidence thereof will be admissible to for any damages calculation.

Accordingly, Plaintiff's motion *in limine* to preclude reference to alcohol, Suboxone, Adderall, and past addiction issues is **DENIED**. However, evidence of Adderall may only be presented in connection with the Plaintiff's medical history, and evidence on the Plaintiff's past drug use will not be admissible in a discussion of the causation of the accident.

### H. MOTION *IN LIMINE* TO PRECLUDE EVIDENCE THAT PLAINTIFF WAS USING HIS CELL PHONE PRIOR TO THE ACCIDENT (DOC. 102).

Plaintiff seeks to preclude evidence that he was using his cell phone prior to the accident. Cell phone records indicate that Plaintiff was on a phone call and sending and receiving text messages in the minutes leading up to the accident. Specifically, Plaintiff's phone records indicate that he was on a call that began at 10:15 p.m. (Doc. 103-1, at 15). That call lasted

approximately three minutes, or until 10:18 p.m. (Doc. 103-1, at 15). The call to dispatch reporting the accident occurred at 10:21 p.m., only three minutes after phone records indicate that the call concluded. (Doc. 103-1).

The Court finds that evidence concerning whether Knecht was on the phone at the time of the accident is relevant. *See Prescott v. R&L Transfer, Inc.*, No. CV 3:11-203, 2015 WL 12567260, at *5 (W.D. Pa. Apr. 28, 2015). As stated repeatedly throughout this memorandum, issues of negligence and causation are at issue in this case, and the Court finds the behavior and actions of Plaintiff in the minutes leading up to the accident is highly probative and any danger or risk of prejudice is greatly outweighed by the probative value of the evidence. As such, Plaintiff's motion to preclude evidence that he was using his cell phone prior to the accident (Doc. 102) is **DENIED.**

I.  MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OF PLAINTIFF'S CRIMINAL HISTORY, LICENSE SUSPENSION, DRIVING RECORD, AND CITATIONS (DOC. 104)

Plaintiff seeks to preclude testimony and evidence of his criminal history, alleged license suspension, driving record, and citations related to this crash.

**1.  Criminal History, License Suspension, and Driving Record**

This history and conduct includes two summary offenses to which Plaintiff pled guilty in 2013, for disorderly conduct and public drunkenness, a speeding violation, a traffic control violation, and a temporary suspension or restriction of his driver's license. In accordance with the standards set forth under Federal Rule of Evidence 404(b), the Court will grant the motion *in limine* with respect to Plaintiff's criminal history of the two summary offenses, the speeding violations, and the traffic control violation. *See* Fed. R. Evid. 404(b); *Becker v. ARCO Chem. Co.*, 207 F.3d 176, 189 (3d Cir. 2000). To the extent Plaintiff's motion seeks to preclude any

evidence of any alleged **suspension** of Plaintiff's license, the motion will be granted. However, evidence will be allowed with regard to any medical restrictions in place at the time of the accident.

### 2. Citations Related To This Crash

Plaintiff also seeks to preclude evidence of the two citations Plaintiff was issued in relation to this accident that forms the basis of this case. Plaintiff was cited for two violations in relation to this accident, both of which were subsequently adjudged not guilty. Although Plaintiff correctly submits that the Pennsylvania Supreme Court has held that evidence of a conviction of a traffic violation is not admissible in a civil suit for damages arising out of the same traffic violation, *Loughner v. Schmelzer*, 421 Pa. 283 (1966), but the present case, is governed by federal procedure, not Pennsylvania procedure. *Allen v. Fletcher*, No. 3:07-CV-722, 2009 WL 3103828, at *2 (M.D. Pa. Sept. 24, 2009); *Rain v. Pavkov*, 357 F.2d 506, 510 (3d Cir.1966) ("While the statutory rule of Pennsylvania, upon which the court below relied, is clearly to the contrary, it is not controlling in an action in the federal courts.").

Under the Federal Rules of Evidence there are two questions: 1) is evidence inadmissible hearsay, and 2) is it inadmissible under the balancing test of Rule 403. *Malantonio v. Boyle*, No. 15-6444, 2017 WL 633997, at *1 (E.D. Pa. Feb. 16, 2017). In determining whether the traffic citation is inadmissible hearsay, the Court must consider the trustworthiness of the citation. *Prescott v. R&l Transfer, Inc.*, No. CV 3:11-203, 2015 WL 12564232, at *4 (W.D. Pa. Apr. 21, 2015); *U.S. v. Versaint*, 849 F. 2d 827, 831 (3d Cir. 1988). In *Prescott*, the Court found the citation to lack the sufficient guarantee of trustworthiness, as it was unclear whether a citation was ever even issued, whether the plaintiff had ever been charged, plaintiff had not been found guilty, and he had not paid a fine. *Id.* However, in the present case, the citation was issued,

Plaintiff was charged, and his citations proceeded to a summary proceeding before the magisterial district justice. At the conclusion of that proceeding, the magisterial district justice entered a not guilty finding on both citations. As such, the Court finds that there is a guarantee of trustworthiness in the citation issued that did not exist in *Prescott*, and therefore makes this case distinguishable. As such, the Court turns to the question of whether the evidence is inadmissible under Rule 403. The Court finds that the probative value of the citations outweighs any potential prejudice. First, the issuance of the citations may have some probative value in helping the jury determine the facts of the accident and whether Plaintiff contributed to the accident, *see Prescott*, 2015 WL 12564232, at *5 (evidence regarding the traffic citation is probative of whether Plaintiff's unsafe driving contributed to the accident). Second, any potential prejudice is minimal, particularly given the finding of not guilty by the magisterial district justice.[4]

For the foregoing reasons, the Court will deny Plaintiff's motion to preclude evidence of the citations.

---

[4] Notably, a number of courts in this jurisdiction have found that traffic citations are admissible, and the prejudice does not outweigh the evidence's probative value even where a guilty plea was entered or fine was paid. The prejudice here is even less. *See Malantonio v. Boyle*, No. 15-6444, 2017 WL 633997, at *1 (E.D. Pa. Feb. 16, 2017) *Allen v. Fletcher*, No. 3:07-CV-722, 2009 WL 3103828, at *2 (M.D. Pa. Sept. 24, 2009); *Grosek v. Panther Transp., Inc.*, No. 3:07–cv–1592, 2009 U.S. Dist. LEXIS 13300, *11–*14, 2009 WL 427238 (M.D.Pa. Feb. 20, 2009).

J.  MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OF PLAINTIFF'S PRIOR ACCIDENTS (DOC. 106)

Plaintiff seeks to preclude testimony or evidence of prior accidents involving the Plaintiff on the basis that such evidence is not relevant and will likely confuse the jury. (Doc. 106; Doc. 107). Specifically, Plaintiff seeks to preclude any evidence of a bicycle accident in 2007, on the grounds that the bicycle accident is too dissimilar to the instant tractor-trailer accident to have any relevance, and even if it were relevant, any relevance is outweighed by the danger of prejudice or confusion to the jury. Defendants submit that they do not seek to offer this evidence to establish that Plaintiff is accident-prone, but that it is relevant to his traumatic brain injury and cognitive conditions at issue in this case. Plaintiff admitted in his deposition that when he had his bicycle accident, he did hit his head. (Doc. 107-1). Further, Plaintiff conceded at oral argument that Plaintiff's medical history is relevant.

District courts have broad discretion in determining what evidence is relevant, and in evaluating probative value versus unfair prejudice. *Cowgill v. Raymark Indus., Inc.*, 832 F.2d 798, 806 (3d Cir.1987) (*citing United States v. Long*, 574 F.2d 761, 767 (3d Cir.1978)). The injuries claimed by Plaintiff in this case include traumatic brain injury and cognitive issues. The Court finds that a prior injury to the head is relevant to the issues in this case, and further, any possible prejudice may be cured on examination by the parties and through the use of experts, and further, that any possible prejudice does not outweigh the probative value of this evidence. As such, the Court will deny Plaintiff's motion to preclude evidence of Plaintiff's prior accidents.

## IV. CONCLUSION

For the foregoing reasons, the parties' motions *in limine* are granted or denied as follows:

1. Defendants' motion *in limine* seeking to limit Dr. Ardo's testimony (Doc. 84) is **GRANTED**;

2. Plaintiff's motion *in limine* seeking to preclude evidence or testimony of Plaintiff not wearing his seatbelt (Doc. 100) is **GRANTED**;

3. Plaintiff's motion *in limine* seeking to preclude Defendants' rebuttal expert reports (Doc. 109) is **WITHDRAWN AS MOOT**;

4. Plaintiff's motion *in limine* for spoliation (Doc. 92) is **DENIED**;

5. Defendants' motion *in limine* to preclude any evidence or reference to an alleged PIT-type maneuver (Doc. 86) is **GRANTED**;

6. Defendant's motion *in limine* to preclude evidence of prior moving violations and citations by Defendant Balanescu (Doc. 88) is **GRANTED** as to Defendant Balanescu's previous driving under the influence charges, **and DENIED** as to Defendant Balanescu's remaining prior moving violations;

7. Defendant's motion *in limine* to preclude evidence of post-accident drug and alcohol testing of Defendant Balanescu (Doc. 90) is **GRANTED**;

8. Defendants' motion *in limine* to preclude evidence of alleged hours of service or Federal Motor Carrier Safety Regulations violations (Doc. 96) is **GRANTED** in part and **DENIED** in part. The motion is granted with respect to Dr. Gomer's testimony and opinion on alleged hours violations. It is denied in all other aspects.

9. Plaintiff's motion *in limine* (Doc. 98) to preclude reference to Plaintiff's blood alcohol level is **DENIED**; to preclude reference to Plaintiff's use of Adderall is **DENIED**,

except to the extent provided in the accompanying Memorandum; to preclude reference to Plaintiff's use of Suboxone is **DENIED**; and to preclude reference to Plaintiff's past drug use is **DENIED**.

10. Plaintiff's motion *in limine* to preclude evidence that Plaintiff was using his cell phone prior to the accident (Doc. 102) is **DENIED**;

11. Defendant's motion *in limine* to preclude evidence of Plaintiff's Criminal History, License Suspension, Driving Record, and Citations (Doc. 104) is **GRANTED** in part and **DENIED** in part. Evidence of Plaintiff's criminal history, license suspension, and driving record shall be precluded at the time of trial. Evidence of any medical restrictions on Plaintiff's driving, and evidence of the citations related to the accident in this case will not be precluded; and

12. Plaintiff's motion *in limine* to preclude evidence of Plaintiff's prior accidents (Doc. 106) is **DENIED**.

An appropriate Order follows.

**Dated: October 30, 2017**                         *s/ Karoline Mehalchick*
                                                    **KAROLINE MEHALCHICK**
                                                    **United States Magistrate Judge**